IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ITT INDUSTRIES, INC.,           §
                                §
        Petitioner,             §
                                §
v.                              §         CASE NO. 4:09-MC-348
                                §
S.K.,                           §
                                §
        Respondent.             §
                                §

## MEMORANDUM OPINION AND ORDER

Pending before the court[1] is Petitioner's Petition for Review
(Docket Entry No. 1).  The court has considered the petition, all
relevant filings, and the applicable law.  For the reasons set
forth below, the court **DENIES** Petitioner's petition and **MODIFIES**
the ALJ's decision to the extent outlined below.

## I.  Case Background

Petitioner ITT Industries, Inc., ("Petitioner") filed this
miscellaneous action on July 8, 2009, for judicial review of an
unfavorable decision by the Benefits Review Board ("BRB") of the
Eighth Compensation District of the United States Department of
Labor ("DOL") regarding the claim of respondent S.K. ("Claimant")
for disability benefits against his employer, Petitioner, under the
Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C.
§ 901, et seq., and its extension, the Defense Base Act ("DBA"), 42

---

[1]     The parties consented to proceed before the undersigned magistrate
judge for all proceedings, including trial and final judgment, pursuant to 28
U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 10,
12-13.

U.S.C. § 1651, et seq.

## A.     Jurisdiction

This court has appellate jurisdiction under 33 U.S.C. § 921(c)[2] and 42 U.S.C. § 1653(b),[3] as confirmed by AFIA/CIGNA Worldwide v. Felkner, 930 F.2d 1111 (5th Cir. 1991) (holding that determinations by the BRB on claims originating under the DBA are appealed to the United States district court in which district the deputy commissioner's office is located).  Here, the office of the District Director, Bradley Soshea, is located in Houston, Texas. Thus, this court has appellate jurisdiction over the present appeal.

_____

[2]     Any person adversely affected or aggrieved by a final order of the [BRB] may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such [BRB] order a written petition praying that the order be modified or set aside.  A copy of such petition shall be forthwith transmitted by the clerk of the court, to the [BRB], and to the other parties, and thereupon the [BRB] shall file in the court the record in the proceedings . . . .   Upon such filing, the court shall have jurisdiction of the proceeding and shall have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the [BRB] and enforcing same to the extent that such order is affirmed or modified . . . .

33 U.S.C. § 921(c).

[3]     Judicial proceedings provided under sections 18 and 21 of the [LHWCA, 33 U.S.C. §§ 918, 921,] in respect to a compensation order made pursuant to this chapter shall be instituted in the United States district court of the judicial district wherein is located the office of the deputy commissioner whose compensation order is involved if his office is located in a judicial district . . . .

42 U.S.C. § 1653(b).

**B.    Procedural History**

Upon returning to the United States from a job working for Petitioner in Kuwait, Claimant filed a claim for temporary total disability benefits and for medical expenses incurred as a result of treatment for work-related psychiatric injuries.  The claim was transferred to the Office of Administrative Law Judges of the DOL on August 10, 2007, and was assigned to an administrative law judge ("ALJ") on August 30, 2007.[4]  The ALJ conducted a hearing in Romulus, Michigan, on March 18, 2008.[5]  After listening to Claimant's testimony at the hearing and reviewing additional deposition testimony and the medical record, the ALJ issued a decision in Claimant's favor on August 4, 2008.[6]

Petitioner appealed the ALJ's decision to the BRB, which issued a decision and order affirming the ALJ's opinion on May 13, 2009, thereby making the ALJ's decision the final decision of the BRB.[7]  Having exhausted its administrative remedies, Petitioner filed this action for judicial review of the BRB's decision.

**C.    Factual History**

**1.    Overview**

In February 2005, Petitioner hired Claimant to work as a heavy

---

[4]      Administrative Record ("AR"): ALJ Decision, p. 1.

[5]      Id. at 1-2; see AR: ALJ Hearing.

[6]      See AR: ALJ Decision.

[7]      See Docket Entry No. 7, Petitioner's Brief, p. 1.

3

equipment mechanic in Kuwait. Claimant worked for Petitioner in that capacity until March 2007. During that two-year period, Claimant's co-workers and supervisors verbally harassed him, though he was never physically injured. Because of this harassment, he obtained psychiatric counseling in Kuwait for an extended period until he was repatriated back to the United States in 2007 for care. Back in the United States, he continued to seek medical care and requested disability and medical benefits from Petitioner, asserting that harsh and stressful work conditions caused him severe depression and also aggravated or accelerated a psychiatric condition called post-traumatic stress disorder ("PTSD").

### 2.  Witness Testimony

#### a.  Claimant

Claimant testified that he began working for Petitioner in Kuwait on February 28, 2005.[8]  He worked there as a mechanic, performing tasks ranging from engine maintenance to tire changing on such vehicles as Humvees and Hemet trailers.[9]  He worked in the same location every day for six or seven days a week.[10]  Prior to leaving for Kuwait, he was required to undergo a physical and medical examination, from which he was physically and mentally

---

[8]   AR: ALJ Hearing, pp. 19-20.

[9]   Id. at 22.

[10]   Id. at 21-23.

4

cleared to work.[11]

Soon after his arrival in Kuwait, Claimant's coworkers began calling him names such as "terrorist," "Taliban," "al Qaeda," and "Hezbollah" on an almost daily basis because of his Arabic heritage.[12] One friendly coworker told him that their managers were too afraid of him to do anything about it, while another told him that their boss was "keeping an eye on him."[13] Claimant responded to the name-calling by asking the coworkers to leave him alone, without avail.[14] His supervisors did not try to stop the name-calling, and Claimant testified that he did not report the behavior because his own supervisor participated in it.[15] After seven months of this harassment, Claimant went to see a psychiatrist, Esam Al-Ansari, M.D., ("Dr. Al-Ansari"), who prescribed him medication.[16]

In March 2007, he was moved to another site.[17] Upon arrival, he began preparing a contact list with each coworker's name and telephone number.[18] One of his new coworkers saw him preparing the

---

[11]  Id. at 33-34.  Claimant had never received psychiatric treatment or psychological counseling before going to Kuwait, and his family members did not have a history of psychiatric counseling.  Id. at 34-35.

[12]  Id. at 23, 25, 42, 45.

[13]  Id. at 46-47.

[14]  Id. at 23-24.

[15]  Id. at 23-24.

[16]  Id. at 25, 49.

[17]  Id. at 27.

[18]  Id. at 27-28.

list and aggressively asked him whether he was going to give the information to al Qaeda.[19]   Claimant testified that he was frightened by the encounter, even though the coworker apologized to him the next day for speaking to him that way.[20]   After this incident, Dr. Al-Ansari increased Claimant's medication, although Claimant testified that the medication was not helping him.[21]

Clamant states that had trouble sleeping, and that he began hearing voices occasionally in his sleep, voices that would say the same things that his coworkers would call him at work.[22]   At one point soon after his transfer, Clamant stayed home from work for five days; his worried roommate found him and took him to get help.[23]  After this incident, Dr. Al-Ansari told Claimant to return to the United States for treatment.[24]   When Claimant went to his employer to say that he needed to return to the United States, he was too nervous to tell them why he needed to be repatriated, so he was instructed to write everything down once he returned to the United States.[25]

Upon returning to the United States on sick leave, Claimant

---

[19]   Id. at 28.

[20]   Id. at 28, 42.

[21]   Id. at 28-29.

[22]   Id. at 29, 43-44.

[23]   Id. at 29, 43.

[24]   Id. at 29.

[25]   Id. at 38.

began treatment in his home city of Detroit, Michigan.[26]  He first saw Mario Demeireles, M.D., ("Dr. Demeireles") and later Chalakudy V. Ramakrishna, M.D. ("Dr. Ramakrishna").[27]  About two or three months after his return from Kuwait, he attempted suicide, for which he was hospitalized for five days.[28]  He has been "deeply" angry about how he was treated in Kuwait ever since his return.[29]

**b.  Thompson**

Michael Thompson ("Thompson") was a mechanic with ITT who worked with Claimant from June 2005 to late 2006 or early 2007.[30] He heard his coworkers and supervisor call Claimant names like "terrorist" and "Taliban," occurrences which became more frequent throughout the time Thompson and Claimant worked together.[31] Thompson testified that he heard his coworkers say these names directly to Claimant, though Thompson could not remember whether he ever heard their supervisor say such names to Claimant or within Claimant's hearing.[32]  When called these names, Thompson observed that Claimant would get angry, tell them to "shut up," and usually

---

[26]   Id. at 29.

[27]   Id. at 30.

[28]   Id. at 31.

[29]   Id. at 31-33, 37.

[30]   AR: Thompson Deposition, pp. 5, 7.

[31]   Id. at 6-7.

[32]   Id. at 9-10.

7

leave the area for about ten minutes before returning to work.[33]

### c. Martin

Teresa Martin ("Martin") was the claims supervisor assigned to investigate Claimant's claim on April 3, 2007.[34]  Claimant told Martin that he was "having emotional and psychological difficulties due to being called names at work."[35]  He told her specifically of one instance wherein a coworker aggressively approached him about the job Claimant was doing, which culminated in the coworker asking Claimant if he was "a Taliban or something."[36]  This was the only incident that Claimant reported to Martin, although he also told her that the harassment he endured was only verbal, never physical.[37]  A Human Resources representative for Petitioner confirmed to Martin that Claimant was called "Taliban" but stressed that it was done in a joking manner.[38]  Martin did not contact any of Claimant's coworkers to obtain statements.[39]  Upon completion of her investigation, Claimant's claim was denied.[40]

### 3. Claimant's Medical Record

---

[33]   Id. at 10.

[34]   AR: Martin's Deposition, pp. 4-5.

[35]   Id. at 6.

[36]   Id.

[37]   Id.

[38]   Id. at 8.

[39]   Id. at 12.

[40]   Id. at 8.

8

### a.   Dr. Al-Ansari

On March 18, 2007, Dr. Al-Ansari, a consultant psychiatrist, wrote a medical report at Claimant's request for Petitioner, wherein he outlined his history of treating Claimant.[41]  He first saw Claimant on September 3, 2006, and had then diagnosed him with "a Depressive Disorder due to many psychosocial and occupational stressors."[42]  Dr. Al-Ansari gave him "the Appropriate medications" and saw him regularly for the following six months.[43]  He last saw Claimant on March 17, 2007, at which point Claimant "showed an increase in the intensity of his symptoms, insomnia and lack of attention and concentration."[44]  Dr. Al-Ansari advised Claimant to continue his treatment and to take three or four weeks of sick leave.[45]

### b.   Dr. Demeireles

Back in the United States, Dr. Demeireles evaluated Claimant's ability to return to work with Defendant on March 29, 2007.[46] Claimant told him that he was taking Xanax and Effexor and that he

---

[41]     AR: Claimant's Trial Notebook ("TN"), Ex. 6, Medical Records of Dr. Al-Ansari, p. 1.

[42]     Id.

[43]     Id.

[44]     Id.

[45]     Id.

[46]     AR: Claimant's TN, Ex. 7, Medical Records of Dr. Demeireles, p. 2.

was unable to concentrate.[47]  Dr. Demeireles diagnosed Claimant as having anxiety and possible PTSD, advising Claimant to rest until further notice.[48]  On April 4, 2007, Dr. Demeireles concluded that Claimant could not return to his job as a heavy mobile equipment mechanic with Petitioner.[49]  On April 30, 2007, medical notes mentioned PTSD, though without elaboration.[50] On June 11, 2007, Dr. Demeireles stated that he agreed with the amount of medication that Claimant was then taking for his PTSD diagnosis.[51]

### c.   Dr. Ramakrishna

On June 18, 2007, Claimant received a clinical assessment by Dr. Ramakrishna.[52]  Claimant expressed that he had been depressed since August 2006, after having endured severe harassment from his coworkers and staff.[53]  Claimant stated that he had complained to his boss, who did nothing.[54]  Claimant reported becoming "extremely angry, upset, agitated, irritable," and short-tempered, and he no

---

[47]   Id. at 39-41.

[48]   Id. at 2, 39-41.

[49]   Id. at 1.

[50]   Id. at 27-29.

[51]   Id. at 12-14.

[52]   AR: Claimant's TN, Ex. 4, Medical Records of Dr. Ramakrishna, pp. 1-4.

[53]   Id. at 1.

[54]   Id.

longer wanted to leave his house.[55]   He said he felt very anxious, cried often, lacked energy, felt "shut down," and could not complete simple tasks.[56]   He denied auditory or visual hallucinations.[57]   Dr. Ramakrishna diagnosed Claimant with major depression and told him to continue with his current dosage of medication, Effexor, and to make a follow-up appointment for two weeks later.[58]

On July 2, 2007, Claimant returned to see Dr. Ramakrishna, complaining of depression, difficulty sleeping, difficulty concentrating, and feelings of paranoia, of people watching him, and of people talking about him.[59]   Claimant's medication at that time included Effexor, Xanax, Abilify, and Zyprexa.[60]   Dr. Ramakrishna advised Claimant to decrease his dosage of Xanax, to not drive or operate any machinery, and to return in two weeks.[61]

On July 23, 2007, Dr. Ramakrishna learned that Claimant had attempted suicide a few months prior.[62]   Claimant had run out of

---

[55]  Id.

[56]  Id.

[57]  Id. at 2.

[58]  Id. at 1, 3-4.

[59]  Id. at 5.

[60]  Id.

[61]  Id.

[62]  Id. at 6.

medication and so was no longer taking it.[63]  Dr. Ramakrishna advised Claimant to take his medication as prescribed, not to use any mind-altering substances, and to attend a day program to help with his depression, which he was expected to begin that week.[64]

On July 30, 2007, Claimant told Dr. Ramakrishna that something had happened in Kuwait causing him to be severely depressed for four days and not come out of his house there, where he simply sat at home staring at the wall.[65]  He also told Dr. Ramakrishna that he had been seeing a psychiatrist there, who upon determining that Claimant was ill had sent him back to the United States.[66]  Claimant was resistant to attending the day program because of the costs, in spite of Dr. Ramakrishna's emphasis on the importance of seeing a therapist.[67]  Claimant continued to take Zyprexa, Abilify, Effexor, and Xanax.[68]  Dr. Ramakrishna advised Claimant to use his medication as prescribed, not to use any other mind-altering substances, and to make a follow-up appointment for two weeks later.[69]

d.   Dr. Mercier

---

[63]   Id.

[64]   Id.

[65]   Id. at 7.

[66]   Id.

[67]   Id.

[68]   Id.

[69]   Id.

Raymond Mercier, M.D., ("Dr. Mercier") conducted an independent psychiatric evaluation unrelated to Claimant's care and treatment on October 2, 2007.[70]  Dr. Mercier found that Claimant's symptoms included nervousness, anger, auditory hallucinations, sleeplessness, a suicide attempt, trouble concentrating, depression, bad dreams, loneliness, fear of people, lack of sexual desire, confusion, an extremely flat affect, and disconnect between his perceptions, thoughts, and emotions.[71]  Claimant complained of several circumstances causing these symptoms, primarily "horrible" working conditions, including the dust and high temperatures, and harassment by coworkers and a supervisor.[72]  Dr. Mercier believed that Claimant's symptoms were personal, not environmental, because Claimant had been in the United States for six months at the time of his examination and there had been no reduction in symptoms, as he would have expected, after Claimant was extracted from his difficult working environment in Kuwait.[73]  Dr. Mercier ultimately diagnosed Claimant as having an unspecified psychosis he believed would prove to be schizophrenia.[74]  He recommended that Claimant

---

[70]     AR: Claimant's TN, Ex. 8, Psychological Report by Dr. Mercier, p. 1. Dr. Mercier issued his report the next day, on October 3, 2007.  Id.

[71]     Id. at 3, 5-9.

[72]     Id. at 2-3, 6, 8-9.

[73]     Id. at 9.

[74]     Id.

undergo psychiatric treatment and take antipsychotic medications.[75]

He also opined that Claimant was disabled from regular employment.[76]

### e.   Dr. Salameh

Waleed A. Salameh, Ph.D., ("Dr. Salameh"), a clinical and consulting psychologist, issued a comprehensive psychological clinical report and evaluation on Claimant on March 11, 2008, having interviewed Claimant by telephone on February 29, 2008, and both Claimant and his wife on March 6, 2008.[77] Claimant complained of difficulties during his employment with Defendant:[78]

> After arriving in Kuwait, the patient started working immediately at the Arifjan Army Camp as noted above. He stated that he lived ten minutes away from work in an apartment complex and initially had a British Roommate who he did not see much except on their day off from work. The details of his work situation are as follows:[79]
>
> The patient was assigned as a mechanic working on big trucks to repair the trucks, change brakes, perform maintenance, and change oil. He stated that he was the only Arab-American within a group of fifteen mechanics to which he was assigned.[80]
>
> In the course of this employment, the patient encountered a supervisor Jerry (Jarold) Smollen. Mr. Smollen was the

---

[75]   Id. at 10.

[76]   Id.

[77]   AR: Claimant's TN, Ex. 5, Psychological Report by Dr. Salameh, pp. 1-2.

[78]   The court quotes Dr. Salameh's report nearly in full on this point, as it is critical to its later discussion of Claimant's PTSD diagnosis. See id. at 6-9.

[79]   Id. at 6.

[80]   Id.

patient's direct supervisor at his employment. [Claimant] clearly felt from the outset that Mr. Smollen had a discriminatory and racist attitude toward him simply because [Claimant] was Arab-American. He states that his apprehensions were validated by a coworker called Audie: "Audie asked me 'why is Jerry Smollen against you?' I asked Audie why he said that and Audie told me that at one of the morning meetings that I did not attend, Smollen told my other coworkers 'pay attention to [Claimant]. Keep an eye on him. He could be planning something, he could be dangerous, he could be a terrorist.'"[81]

The patient stated that, in response [to] Mr. Smollen's racist attitude and commentaries, he "ignored the situation, tried to focus on my work. I didn't want any trouble. I didn't want to be fired because I had seen other people get fired. I wanted to keep my job."[82]

The patient felt that his stigma as a "terrorist" spread to other coworkers besides Mr. Smollen. Other coworkers called him "sand nigger" and ["]Hizbollah." In yet another instance, a British coworker by the name of Neil "called me a terrorist. We had a fight but with words."[83]

During this same timeframe, Mr. Smollen continued with his derogatory comments regarding the patient and other Arabs and/or Muslims: "When Smollen heard about demonstration problems in Kuwait in reaction to the publication in Denmark of caricature cartoons of the prophet Mohammed, Smollen commented in front of me: 'Now they show their true colors.'"[84]

[Claimant's] work situation worsened when his coworkers started dissociating from him and discriminating against him: "Other coworkers were calling me 'terrorist' in the cafeteria, saying 'don't sit with us' if I tried to sit at the same table during lunch breaks. This is when I started talking with Indian workers because they

---

[81]    Id. at 6-7.

[82]    Id. at 7.

[83]    Id.

[84]    Id.

respected me."[85]

The patient's wife and children came to visit him for a period of one month in August 2006.  As described by [Claimant], Mrs. Kamal noticed that the patient had changed and seemed distressed: "She noticed that I felt very stressed out.  I told her that I am very nervous and explained what was happening at work.  She also noticed that I was yelling at the kids, was short-tempered with them, and did not want to go on family outings.  I would wake up startled and screaming at night.  My wife suggested that I see somebody for my problems."[86]

The patient followed his wife's advice and sought help with a psychiatrist practicing in Kuwait, [Dr. Al-Ansari], beginning in September 2006 . . . .[87]

At the end of 2006, the patient reported that "Jerry Smollen was transferred and we were transferred.  We moved to Building 40 - Final Bay.  As of the beginning of 2007 I had a new supervisor, Mr. Steve McGinness.  I requested to move to the AC section from Final Bay which he did in three days.  I then had a new supervisor, Tex."[88]

Tex went on vacation and the patient was still working in the AC section when he had another altercation at work with a coworker called Neil Wade.  "I was keeping an attendance sheet with the names of all the workers in our section.  He got mad about that.  He yelled at me 'Are you with Taliban?  Are you a terrorist?  Why are you writing my name?'"[89]

Following this altercation, [Claimant] felt increasingly despondent and reported his condition to Dr. Al-Ansari who increased his Xanax medication dosage: "I could not concentrate, I felt I was losing my mind.  I became more

---

[85]    Id.

[86]    Id. at 8.

[87]    Id.

[88]    id.

[89]    Id. at 8-9.

16

isolated, even moved away from the Indians."[90]

In March 2007, the patient's situation deteriorated drastically: "On March 14 or 15, 2007, my roommate found my car parked in the same place and got worried about me. I had closed the curtains in my room, had grown a beard, was closed up inside my room for four days not working and not answering the phone.  I had not slept for three days.  My new roommate . . . took me to Dr. Al-Ansari. Dr. Al-Ansari gave me a pill to go to sleep . . . ."[91]

Following this occurrence, the patient left Kuwait in late March 2007 and returned home to Detroit, Michigan . . . .[92]

Dr. Salameh next reviewed Claimant's medical records and a few documents submitted by Claimant.[93]  He then discussed Claimant's clinical symptoms, which included: severe depression, recurrent feelings of shame about being unable to provide financially for his family, high anxiety and inability to sleep, marital conflicts with his wife, significantly decreased sexual relations with his wife, strained rapport with his children, social isolation and short-temperedness, recurrent and intense feelings of anger when thinking about the repeated incidents of discrimination he experienced in Kuwait, negative body-image disturbance, intermittent flashbacks of his racial harassment episodes, and ongoing difficulties with confusion, poor concentration, reduced attention span, and inability

---

[90]    Id. at 9.

[91]    Id.

[92]    Id.

[93]    Id. at 10-15.

to focus.[94]   Specifically with respect to Claimant's symptoms of PTSD, Dr. Salameh wrote:

> [Claimant] exhibits the clinical signs of a chronic and
> unremitting [PTSD].  His PTSD symptoms include feelings
> of depersonalization and derealization, nightmares, and
> auditory hallucinations that invariably occur at night:
> "I feel like somebody's trying to kill me, suffocate me.
> I always have nightmares at night . . . and wake up
> screaming.  Sometimes, just before I go to sleep at
> night, I feel like someone who sounds like one of my coworkers is talking to me: 'Go away,' 'we don't want you here' or
> 'You sand nigger.'"[95]

Dr. Salameh next thoroughly reviewed Dr. Mercier's report and finding that Claimant suffered from psychosis, possibly schizophrenia.[96]   After looking at Claimant's statements, the medical reports, the DSM-IV's discussion of schizophrenia, and Dr. Mercier's findings and opinion, Dr. Salameh opined that Claimant's symptoms did not suggest a diagnosis of psychosis or schizophrenia, but rather were more in line with a diagnosis of PTSD.[97]   Dr. Salameh next recited the diagnostic criteria for PTSD as found in the DSM-IV:

> A.   The person has been exposed to a traumatic event in
> which both of the following were present:
>> (1)  the person experienced, witnessed, or was
>> confronted with an event or events that involved
>> actual or threatened death or serious injury, or a
>> threat to the physical integrity of self or others
>> (2)  the person's response involved intense fear,
>> helplessness, or horror . . . .

---

[94]   Id. at 16-20.

[95]   Id. at 19-20.

[96]   Id. at 20-25.

[97]   Id. at 25-29.

B.   The traumatic event is persistently reexperienced in one (or more) of the following ways:

(1)   recurrent   and   intrusive   distressing recollections of the event, including images, thoughts, or perceptions . . .

(2) recurrent distressing dreams of the event . . .

(3) acting or feeling as if the traumatic event were recurring  (includes  a  sense  of  reliving  the experience,   illusions,   hallucinations,   and dissociative flashback episodes, including those that occur on awakening or when intoxicated) . . .

(4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

(5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

C.   Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following):

(1)   efforts   to   avoid   thoughts,   feelings,   or conversations associated with the trauma

(2) efforts to avoid activities, places, or people that arouse recollections of the trauma

(3) inability to recall an important aspect of the trauma

(4) markedly diminished interest or participation in significant activities

(5)   feeling   of   detachment   or   estrangement   from others

(6) restricted range of affect (e.g., unable to have loving feelings)

(7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D.   Persistent   symptoms   of   increased   arousal   (not present before the trauma), as indicated by two (or more) of the following:

(1) difficulty falling or staying asleep

(2) irritability or outbursts of anger

(3) difficulty concentrating

(4) hypervigilance

(5) exaggerated startle response

19

E.    Duration of the disturbance (symptoms in Criteria B,
C, and D) is more than 1 month.

F.    The    disturbance    causes    clinically    significant
distress or impairment in social, occupational, or other
important areas of functioning.

Specify if:
      Acute: if duration of symptoms is less than 3 months
      Chronic: if duration of symptoms is 3 months or more
Specify if:
      With Delayed Onset: if onset of symptoms is at least
      6 months after the stressor.[98]

Upon review of this criteria for PTSD under the DSM-IV, Dr.

Salameh concluded:

[T]he    diagnostic    criteria    for    his    disorder    include
auditory   hallucinations   as   well   as   feelings   of
depersonalization and derealization that are exhibited by
the individual including some numbing of affect . . . .
These behavioral manifestations are part of the [PTSD]
diagnosis and make sense clinically in this case since
the are contemporaneous to the timeframe within which
[Claimant]   was   feeling   occupationally   distressed.
[Claimant's] auditory hallucinations are nonbizarre: they
are the voices of his racist coworkers making fun of him.
As reported by [Claimant], the content of the auditory
hallucinations is all too familiar: they are a repetition
of the racial slurs that were specifically directed at
him by his coworkers. Based on the above, the balance of
available historical information and work data tends to
support the fact that [Claimant] suffers from [PTSD] that
was initiated, accelerated, and precipitated by racial
harassment perpetrated by his coworkers during his Kuwait
employment from February 28, 2005 to March 15, 2007.[99]

Dr. Salameh ultimately diagnosed Claimant with five disorders:

(1) agitated depressive disorder with low self-esteem, negative

body-image disturbance, intermittent suicide ideation, culturally-

_____

[98]    Id. at 26-28.

[99]    Id. at 28-29.

20

related shame, fatigue, and hopelessness regarding the future; (2) generalized anxiety disorder with insomnia, irritability, mental confusion, hypervigilance, marital discord, and recurrent negative ruminations; (3) hypoactive sexual desire disorder; (4) chronic PTSD with nightmares and auditory hallucinations following his 2005-2007 discriminatory employment experiences in Kuwait; and (5) personality change due to trauma, with avoidant features.[100]

Specifically with respect to his diagnosis of PTSD, Dr. Salameh stated:

> In reviewing the diagnostic criteria for [PTSD] as defined in the [DSM-IV], it is evident that [Claimant's] symptomatology fits with the above diagnosis . . . . [Claimant] is a highly distressed individual currently addressing the consequences of two years of racial discrimination and harassment perpetrated by a supervisor and other coworkers during the course of his employment [with Petitioner] in Kuwait from February 2005 to March 2007. His condition is deemed to have been initiated, precipitated, and accelerated by his employment [with Petitioner].[101]

## II. Standard of Review and Applicable Law

### A. Standard of Review

The court's review of a final decision by the BRB is limited to independently reviewing the record and "considering errors of law and making certain that the BRB adhered to its statutory standard of review of factual determinations, that is, whether the ALJ's findings of fact are supported by substantial evidence and [are]

---

[100]    Id. at 37.

[101]    Id. at 37-38.

21

consistent with the law." <u>Ortco Contractors, Inc. v. Charpentier</u>, 332, F.3d 283, 287 (5th Cir. 2003).  The court may not reweigh or reappraise the evidence or substitute its own judgment for that of the ALJ. <u>La. Ins. Guar. Ass'n v. Bunol</u>, 211 F.3d 294, 296 (5th Cir. 2000).  "That the facts may permit diverse inferences is immaterial. The [ALJ] alone is charged with the duty of selecting the inference which seems most reasonable and his choice, if supported by the evidence, may not be disturbed." <u>Presley v. Tinsley Maint. Serv.</u>, 529 F.2d 433, 436 (5th Cir. 1976).

"Substantial evidence is evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" <u>Hall v. Consolidated Employment Sys., Inc.</u>, 139 F.3d 1025, 1029 (5th Cir. 1998) (quoting <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)).  "Substantial evidence is that relevant evidence—more than a scintilla but less than a preponderance—that would cause a reasonable person to accept the fact finding." <u>Dir., Office of Workers' Comp. Programs, U.S. Dept. of Labor v. Ingalls Shipbuilding, Inc.</u>, 125 F.3d 303, 306 (5th Cir. 1997).  "The requirement of substantial evidence 'is less demanding than that of preponderance of the evidence, and the ALJ's decision need not constitute the sole inference that can be drawn from the facts.'" <u>Hall</u>, 139 F.3d at 1029.

B.  **Applicable Law**

Section 20(a) of the LHWCA states that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter it

shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim comes within the provisions of this chapter." 33 U.S.C. § 920(a). "To invoke the presumption, a claimant must make a prima facie showing that (1) he suffer a harm and (2) a condition of the workplace could have caused, aggravated, or accelerated the harm." Amerada Hess Corp. v. Dir., Office of Worker's Comp., 543 F.3d 755, 761 (5th Cir. 2008)(internal quotations omitted). "If the claimant presents a prima facie case as to these two elements, then an ALJ may presume that the work conditions caused the harm, unless the employer can rebut the presumption through facts—not mere speculation—that harm was *not* work-related." Id. "If the employer rebuts the presumption, it drops out of the case and causation is determined by looking at the totality of the evidence." Id.

The Section 20(a) presumption applies to the claim for compensation, so a prima facie case "must at least allege an injury that arose in the course of employment as well as out of employment." U.S. Indus./Fed. Sheet Metal, Inc. v. Dir., Office of Workers' Comp. Programs, 455 U.S. 608, 615 (1982). In other words, the phrases "arising out of" and "in the course of" are separate requirements to establish an injury: "the former refers to injury causation; the latter refers to the time, place, and circumstances of the injury." See id. Once the employee establishes that his injury is work-related, he is entitled to all reasonable and

necessary medical expenses arising out of that injury.  See 33 U.S.C. § 907.

## III.  <u>Analysis</u>

### A.  **The ALJ's Decision**

In his formal decision issued on August 4, 2008, the ALJ first noted that the parties had stipulated that: (1) should a compensable accident be determined, the applicable accident date was March 17, 2007; (2) no physical injuries were incurred; (3) only psychiatric injuries were being claimed; (4) the parties were subject to the DBA; (5) an employer/employee relationship existed at the time of the alleged injury; (6) Claimant's average weekly wage was $1,750.00; (7) the employer received timely notice of the alleged injury; (8) the notice of controversion was timely filed; (9) compensation and medical benefits had not been paid; and (10) if the claim were determined compensable, Claimant was temporarily totally disabled from March 17, 2007, and onward.[102]  The ALJ then stated that the "sole issue presented for resolution is whether Claimant sustained a compensable psychiatric injury arising from his employment with Employer."[103]

After summarizing the testimony by Claimant, Martin, and Thompson, along with the medical evidence from Dr. Al-Ansari, Dr.

---

[102]   AR: ALJ Decision, p. 2.

[103]   <u>Id.</u>

24

Demeireles, Dr. Ramakrishna, Dr. Mercier, and Dr. Salameh,[104] the ALJ discussed the two prongs of Claimant's prima facie claim for compensation under the DBA: (1) whether Claimant sustained physical harm or pain, and (2) whether an accident occurred in the course of employment, or conditions existed at work, which could have caused the harm or pain.[105]

The ALJ found Claimant's testimony credible and consistent with the reports he made to his psychiatrists.[106]  He then found that Claimant met the first prong of his prima facie case, i.e., showing that a psychological injury occurred, because: (1) Dr. Al-Ansari treated him for depressive disorder in Kuwait; (2) Dr. Demeireles diagnosed him with PTSD upon his return from Kuwait and treated him accordingly for two-and-a-half months; (3) Dr. Ramakrishna diagnosed him with major depression and treated him accordingly for three months; and (4) Dr. Salameh diagnosed him with PTSD.[107]

The ALJ then found that Claimant met the second prong of his prima facie case, i.e., that his psychological injury arose out of his employment with Petitioner, because: (1) Claimant testified of daily harassment by coworkers; (2) Thompson corroborated Claimant's testimony; (3) Martin testified that Claimant had been called

---

[104]   Id. at 3-8.

[105]   Id. at 9.

[106]   Id. at 10.

[107]   Id. at 10-11.

Taliban at least once; (4) Claimant consistently reported to his psychiatrists that he was harassed by his coworkers; and (5) Dr. Al-Ansari, Dr. Ramakrishna, and Dr. Salameh all averred that Claimant's psychological injuries were due to his working conditions.[108]

Having found that Claimant met his burden, the ALJ next determined whether Petitioner presented sufficient evidence rebutting Claimant's prima facie case.[109]   The ALJ decided that Petitioner did sufficiently rebut Claimant's evidence, because: (1) Dr. Mercier averred that Claimant did not have PTSD but, instead, that he likely had schizophrenia, based on Claimant's self-reporting of the underlying events and his symptoms; and (2) Dr. Mercier averred that neither Claimant's schizophrenia nor any other psychological injury resulted from his working conditions in Kuwait.[110]   Because Petitioner rebutted the presumption created by Claimant's prima facie showing, the ALJ turned to examining and weighing the evidence in its entirety.[111]

The ALJ first noted that every psychiatrist who examined Claimant noted that his clear symptoms of depression and anxiety could be caused by his coworkers' harassment.[112]   He then noted that

---

[108]   Id. at 11.

[109]   Id.

[110]   Id.

[111]   Id.

[112]   Id.

two of his treating psychiatrists, Dr. Al-Ansari and Dr. Ramakrishna, related Claimant's symptoms of depression and PTSD to his harassment.[113] He also noted that Dr. Demeireles, while averring that Claimant had PTSD, did not give an opinion with respect to its causation.[114] He also found that Dr. Salameh's diagnosis of depression and PTSD based on Claimant's symptoms was consistent with the opinions of Claimant's treating psychiatrists.[115]

Second, the ALJ determined that Dr. Mercier's opinion was entitled to little weight, because: (1) he failed to explain why Claimant's symptoms were not consistent with depression; (2) he failed to explain how a diagnosis of schizophrenia was appropriate when there was no prior history or family history of such a condition; (3) he failed to provide a reasoned opinion as to how harassment at work was insufficient to cause psychosis; and (4) his opinion that Claimant was having auditory hallucinations, and was not harassed by his coworkers, was rebutted by other record evidence supporting Claimant's harassment while employed in Kuwait.[116]

Third, the ALJ noted that Dr. Salameh's lengthy opinion "provided a well-documented and reasoned" rebuttal as to why Claimant was not suffering from schizophrenia but instead why his

---

[113]   Id.

[114]   Id.

[115]   Id.

[116]   Id. at 12.

symptoms were more consistent with depression and PTSD.[117]
Therefore, the ALJ concluded that Claimant suffered from depression
and PTSD because of his coworkers' harassment while he was employed
by Petitioner in Kuwait.[118]  Accordingly, the ALJ awarded Claimant
temporary disability benefits, medical benefits, and attorney's fees
and costs.[119]

## B.   Summary of the Parties' Arguments

Petitioner requests judicial review of the ALJ's decision to
grant disability benefits.  In its petition, Petitioner argues that:
(1) the ALJ erred as a matter of law by granting disability benefits
because the DSM-IV diagnostic criteria for PTSD and depression were
not established; and (2) the ALJ's decision was not supported by
substantial evidence.[120]

Claimant, on the other hand, contends that the ALJ employed
proper legal standards in reviewing the evidence and that the ALJ's
decision is supported by substantial evidence of record.[121]  Claimant
therefore maintains that the ALJ's decision should be affirmed.

## C.   Legal Error: Use of the DSM-IV

Petitioner argues that the ALJ erred as a matter of law by

---

[117]   Id.

[118]   Id.

[119]   Id. at 12-13.

[120]   Docket Entry No. 7, Petitioner's Brief in Support of Petition for
Review of Order of BRB.

[121]   Docket Entry No. 9, Claimant's Reply Brief.

28

granting disability benefits where the DSM-IV diagnostic criteria were not established.   Petitioner cites to numerous ALJ cases providing persuasive authority that a finding of the existence of a psychological injury must be premised on the criteria outlined in the DSM-IV.   However, while many courts have used the DSM-IV as a reference when determining whether to affirm the decision of an ALJ, this court finds no authority for the proposition that the ALJ must not award benefits for a psychological injury that does not follow the criteria outlined in the DSM-IV.

Although this court found no appellate court decision directly on point, the United States Supreme Court and the Fifth Circuit have each discussed the DSM-IV in various other contexts.   First, while the DSM-IV is a static instrument, the Supreme Court has acknowledged that there may be "vigorous debate within the profession about the very contours of [a given] mental disease itself."   Clark v. Arizona, 548 U.S. 735, 774 (2006).   The Court further acknowledged that "[t]he only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment."   Clark, 548 U.S. at 774 (quoting Greenwood v. United States, 350 U.S. 366, 375 (1956)).   "[T]he consequence of this professional ferment is a general caution in treating psychological classifications as predicates" in making legal determinations.   Clark, 735 U.S. at 775.

The DSM-IV itself cautions against total reliance on its

contents:

> When the DSM-IV categories, criteria, and textual
> descriptions are employed for forensic purposes, there
> are significant risks that diagnostic information will be
> misused or misunderstood.  These dangers arise because of
> the imperfect fit between the questions of ultimate
> concern to the law and the information contained in a
> clinical diagnosis.  In most situations, the clinical
> diagnosis of a DSM-IV mental disorder is not sufficient
> to establish the existence for legal purposes of . . .
> "mental diseas[e]" or "mental defect."

Clark, 548 U.S. at 775-76 (citing American Psychiatric Association,

Diagnostic and Statistical Manual of Mental Disorders xxxii-xxxiii

(4th ed. text rev. 2000)).  The Court further quoted the DSM-IV,

stating:

> DSM-IV reflects a consensus about the classification and
> diagnosis of mental disorders derived at the time of its
> initial publication.  New knowledge generated by research
> or clinical experience will undoubtedly lead to an
> increased understanding of the disorders included in DSM-
> IV, to the identification of new disorders, and to the
> removal of some disorders in future classifications.  The
> text and criteria sets included in DSM-IV will require
> reconsideration in light of evolving new information.

Clark, 548 U.S. at 774 (citing DSM-IV at xxxiii).  In other words,

"the science of psychiatry, which informs but does not control

ultimate legal determinations, is an ever-advancing science, whose

distinctions do not seek precisely to mirror those of the law."

Kansas v. Crane, 534 U.S. 407, 413 (2002).

While the Supreme Court has been generally cautionary about

strict use of the DSM-IV, the Fifth Circuit has explicitly stated

that an approach "that treats a particular diagnostic category as

necessary" for making a legal determination "would improperly

surrender to mental health experts the ultimate responsibility of adjudicating" that determination "and just as improperly would take that decision away from the court." United States v. Long, 562 F.3d 325, 332-33 (5th Cir. 2009).

In light of these cases cautioning against requiring a rigid use of psychiatric diagnostic tools such as the DSM-IV when making legal determinations, the court holds that the criteria of the DSM-IV need not be established or even discussed by the ALJ in every instance.[122]

Accordingly, the court overrules Petitioner's first argument, that the BRB erred as a matter of law in ruling that the ALJ is not required to use the DSM-IV in assessing the existence of a psychiatric injury.

## D.    Substantial Evidence

Petitioner also argues that substantial evidence does not support the ALJ's decision.

### 1.    PTSD

Two physicians diagnosed Claimant with PTSD: Dr. Demeireles and Dr. Salameh.  As the ALJ noted, Dr. Demeireles diagnosed Claimant with PTSD, but he failed to provide an opinion as to the cause of

---

[122]    The court's ruling is in no way meant to diminish the importance of the DSM-IV in assessing the existence of psychiatric injury.  The court only rules that the DSM-IV, a non-legal authority, is not binding and need not be referenced or have its criteria strictly applied in every decision made by an ALJ or the BRB.

that condition.[123]   Furthermore, although there are a very few scattered notes on Claimant's condition in the medical records made by Dr. Demeireles, there is nothing indicating that those notes pertained to his diagnosis of PTSD.[124]   Therefore, the court finds that the opinion of Dr. Demeireles that Claimant had PTSD is unsupported.

Dr. Salameh, on the other hand, provided a lengthy report with respect to his PTSD diagnosis.[125]   He opined that Claimant's symptomatology fit within the diagnostic criteria for PTSD as defined in the DSM-IV.[126]   However, having stated such, Dr. Salameh focused on the latter four elements of a PTSD diagnosis while failing to establish all of the requirements of the first element. Specifically, Dr. Salameh neither supported the element nor stated why the requirement that actual or threatened physical harm was unnecessary to his diagnosis.   As the court stated above, a psychiatrist need not use the DSM-IV to make a diagnosis for the court to find that determination to be supported.   However, if a physician explicitly claims to base his diagnosis on the criteria in the DSM-IV, then he must either support those elements or state

---

[123]   See AR: Claimant's TN, Ex. 7, Medical Records of Dr. Demeireles, pp. 2, 12-14, 27-29, 39-41; see also ALJ's Decision, p. 11.

[124]   See AR: Claimant's TN, Ex. 7, Medical Records of Dr. Demeireles, pp. 2, 12-14, 27-29, 39-41.

[125]   See generally AR: Claimant's TN, Ex. 5, Psychological Report by Dr. Salameh.

[126]   AR: Claimant's TN, Ex. 5, Psychological Report by Dr. Salameh, p. 37.

32

why, in his opinion, a particular element need not be supported under the facts of the particular diagnosis.  Here, Dr. Salameh claimed to base his diagnosis on the DSM-IV, but he failed to state why the requirement that actual or threatened physical harm was unnecessary to his diagnosis.  Therefore, the court finds that Dr. Salameh's diagnosis is unsupported by the underlying evidence.

Accordingly, because the psychiatric diagnoses upon which the ALJ relied were unsupported by the evidence, the court finds that the ALJ's opinion that Claimant had PTSD is not supported by substantial evidence.  Petitioner's argument on this point is sustained.

### 2.   Depression

Petitioner also argues that the ALJ's determination that Claimant suffered from work-caused depression is unsupported by substantial evidence.  The court disagrees.

Three physicians diagnosed Claimant with various forms of depression: Dr. Al-Ansari, Dr. Ramakrishna, and Dr. Salameh.

Dr. Al-Ansari diagnosed Claimant with depressive disorder "due to many psychosocial and occupational stressors," with symptoms including insomnia and lack of attention and concentration.[127]

Dr. Ramakrishna diagnosed Claimant with major depression.[128]

---

[127]    AR: Claimant's TN, Ex. 6, Medical Records of Dr. Al-Ansari, p. 1.

[128]    AR: Claimant's TN, Ex. 4, Medical Records of Dr. Ramakrishna, pp. 1, 3-7.

He noted symptoms of anxiety, crying, inability to complete simple tasks, fatigue, difficulty sleeping, difficulty concentrating and remembering, paranoia, mood swings, panic attacks, fright, confusion, and feelings that people were watching and talking about him.[129]   Dr. Ramakrishna also noted that Claimant had made one suicide attempt.[130]

Dr. Salameh diagnosed Claimant with agitated depressive disorder.[131]   He noted symptoms of low self-esteem, negative body-image disturbance, intermittent suicide ideation, and culturally-related shame, fatigue, and hopelessness regarding the future.[132]

Petitioner has presented no argument against Claimant's diagnoses of depression other than that these diagnoses were made without applying the criteria of the DSM-IV.   As the court has already discussed, strict application of the DSM-IV criteria is not a prerequisite for finding that a psychiatrist's diagnosis constitutes substantial evidence.   Dr. Al-Ansari, Dr. Ramakrishna, and Dr. Salameh all noted symptoms exhibited by Claimant and all opined that those were symptoms of a type of depression.   All three also attributed that depression to the occupational stress Claimant suffered from his coworkers' harassment.   Thus, the ALJ relied on

---

[129]   AR: Claimant's TN, Ex. 4, Medical Records of Dr. Ramakrishna, pp. 1, 5; AR: Claimant's TN, Ex. 12, Deposition of Dr. Ramakrishna, 11-12, 24-25, 30.

[130]   AR: Claimant's TN, Ex. 4, Medical Records of Dr. Ramakrishna, p. 5.

[131]   AR: Claimant's TN, Ex. 5, Psychological Report by Dr. Salameh, p. 37.

[132]   Id.

evidence that (1) Claimant was injured (2) and that his injury arose from and was caused by the conditions of his employment. Therefore, the court finds that the ALJ's determination that "Claimant was inflicted with depression . . . as a result of the harassment by his coworkers during his employment with [Petitioner] in Kuwait" is supported by substantial evidence.[133]

Accordingly, Petitioner's argument to the contrary is overruled, and the ALJ's decision on this point is affirmed.

**E.   Benefits, Expenses, and Attorney's Fees and Costs**

The court must address the ALJ's orders with respect to Claimant's monetary awards from Petitioner.

First, the ALJ ordered Petitioner to pay Claimant temporary total disability benefits from March 17, 2007, through the date of his opinion and continuing based on an average weekly wage of $1,750.00.[134]   Second, the ALJ ordered Petitioner to pay medical expenses incurred by Claimant for treatment to his work-related injury to his feet and PTSD.[135]   Third, the ALJ ordered Petitioner to pay Claimant's attorney's fees and costs, as established by a supplemental order.[136]

---

[133]   See AR: ALJ's Decision, p. 12.

[134]   Id. at 13.

[135]   Id.

[136]   Id.

The court is unclear why the ALJ awarded medical benefits to Claimant for purported foot-related work injuries.[137]   The court concludes that it is simply a typographical error, however, because there is no support for a foot-related work injury in the record and because the parties stipulated that no physical injuries, only psychiatric injuries, occurred.[138]   Therefore, the court overrules the ALJ's award of medical benefits for foot-related workplace injuries.

The court believes that the ALJ meant to award Claimant medical benefits for depression and PTSD, not for feet and PTSD.  The court has already found that the ALJ's conclusion with respect to PTSD was unsupported, and thus the court overrules the ALJ's award of medical benefits for treatment of PTSD.  However, the court **ORDERS** Petitioner to pay medical expenses incurred by Claimant for treatment of his work-related depression pursuant to Section 7 of the Act.   See 33 U.S.C. § 907 (stating that once an employee establishes that his injury was work-related, he is entitled to all reasonable and necessary medical expenses related to that injury).

## IV.  Conclusion

Based on the foregoing, the court **DENIES** Petitioner's petition and **MODIFIES** the ALJ's decision to the extent outlined above.

**SIGNED** in Houston, Texas, this 1st day of March, 2011.

---

[137]    See id.

[138]    See AR: ALJ Decision, p. 2.

Nancy K. Johnson
United States Magistrate Judge